**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 26-042** |
| **SAMUEL D. MARCUS** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

While employed by the United States Department of Defense, the defendant Samuel D. Marcus moonlighted as a money mule for a group of Nigerian-based fraudsters and laundered millions of stolen dollars through more than a dozen bank and cryptocurrency accounts. Marcus laundered money in 2023 and 2024 despite describing his co-conspirators as "scammers" who carried out "sophisticated online fraud" schemes. Marcus continued to launder money in 2025 even after being confronted by the FBI and being told the money he was transferring had been stolen from other people. Marcus also affirmatively misled and lied to his financial institutions about the funds, to include sending fraudulent invoices to his banks to make the transactions appear legitimate.

While Marcus knew that his conduct was wrong and was appropriately held criminally accountable, there is also no question that Marcus' cognitive and social impediments made him more susceptible and corruptible to his handlers' incessant requests to engage in fraudulent transfers. As result, a variance to a sentence of time-served – approximately eight and a half months in prison – is appropriate in this case after the Court considers the sentencing factors under 18 U.S.S.G. § 3553(a), followed by three years of close supervision and tailored release conditions that include limitations and monitoring of Marcus' financial activity and internet use, along with structured programming to include mental health treatment.

# I. BACKGROUND

## A. Procedural History

On January 22, 2026, a federal grand jury returned an eight-count indictment against defendant Samuel D. Marcus for conspiracy to commit money laundering, illegal monetary transactions, and concealment money laundering, in violation of 18 U.S.C. §§ 1956 and 1957. ECF 1. Following his arrest on February 3, 2026, Marcus was detained due to a unique combination of risk factors, including a significant volume of disturbing phone messages related to self-harm and harm of others, access to multiple firearms, lack of community, apparent eagerness to please his Nigerian counterparts, uncertainty as to his mental health status, loss of his employment and social network, and his criminal charges, among other factors. ECF 12, 17.

On July 6, 2026, Marcus pled guilty to Count 8 of the indictment, charging concealment money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2, pursuant to a written plea agreement which included a stipulation to the loss amount range and an appellate waiver. ECF 27, 30. In the plea agreement, the government agreed to recommend a downward variance to a sentence of time-served because the defendant committed the offense of conviction while living with static encephalopathy and/or autism spectrum disorder, and those conditions contributed to his commission of the offense. *Id.* The parties also agreed to supervised release conditions, to include an initial period of community confinement, mental health treatment, prohibitions on new financial accounts, disclosure of financial records, searches of his devices, and computer monitoring software. *Id.*

The Probation Office subsequently prepared a comprehensive Presentence Investigation Report ("PSR"), which outlined the offense conduct, determined the loss amount to be $2,717,801, and correctly calculated the applicable Sentencing Guidelines as 37 to 46 months.

PSR ¶¶ 11, 33, 102. There are no unresolved objections to the PSR or advisory guidelines range. Sentencing is scheduled for 10:30 a.m. on October 16, 2026.

### B. Offense Conduct

After falling victim to a romance fraud scheme in late 2022 and early 2023, defendant Samuel D. Marcus then knowingly served as a money mule for the same group of Nigerian-based fraudsters that initially victimized him. Between mid-2023 and 2025, Marcus and his business, SDM Clearing Depo LLC, laundered significant sums of money through more than a dozen bank accounts. Marcus converted most of the funds into cryptocurrency before it was moved into foreign accounts. The money laundered through Marcus' accounts was taken from U.S. victims through various romance fraud, cyber fraud, tax fraud, financing fraud, and business email compromise schemes.

Marcus continued to launder funds despite informing his banks in mid-2023 that (a) he knew the Nigerians "Rachel Jude" and "Ned McMurray" were "scammers" who sent "fraudulent wire transfers" and committed "sophisticated online fraud", and (b) referencing and citing the bank's obligations to report "money laundering." Marcus also continued to launder funds in 2025 after being confronted in-person by the FBI and being told the money he was transferring had been stolen from other people. Marcus' correspondence shows that he misled and lied to a couple of his financial institutions about some of the transfers, and that he also sent fraudulent invoices to his financial institutions in order to make the fraudulent transactions appear legitimate. When confronted by the FBI, Marcus made numerous admissions, to include his knowledge that the scammers Judge and McMurray were Nigerian, his movement of at least $2 million dollars in victim funds through his accounts at their direction, that he kept a small amount of the money for himself, and that he continued to work with the scammers after initially reporting them to the

police in 2023. At the time of his arrest, Marcus had over 100 credit, debit, and other financial cards on his person.

As to Count Eight specifically, on October 8, 2025, Marcus, McMurray, and another money mule were involved in the wire transfers of $23,500 and $25,000 ($48,500 total), which were deposited into Marcus' WSFS Bank account ending in x7968. The FBI's tracing of the funds showed the funds originated from an elderly couple in Oklahoma. When questioned about the transactions, Marcus provided his bank with false explanations and forged invoices justifying the transfers as payments for thousands of retro game-boy video games that Marcus' company had shipped to Seattle, Washington.

The FBI obtained screenshots of WhatsApp and text messages between Marcus and a McMurray from October and November 2025, in which McMurray provided Marcus with information about the incoming transfers including a false explanation that the purpose of the transfers was to pay for "car storage." Marcus, McMurray, and another money mule also discussed delays and issues related to WSFS' subsequent freeze of the funds. When interviewed by the FBI on December 1, 2025, Marcus initially claimed the transfers were a gift, and then stated the money was for his gaming business, before admitting that the money transferred on October 8, 2025, was part of a scam carried out by Nigerian fraudsters.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

For Count Eight, charging concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the statutory maximum term of imprisonment is 20 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100. Full restitution shall be ordered. Forfeiture of all property involved in the offense also may be ordered.

### B. <u>Sentencing Guidelines Calculation</u>

The Probation Office correctly calculated the defendant's advisory guideline range as 37 to 46 months' imprisonment. PSR ¶ 102. This range is calculated as follows: the base offense level is 6, which is increased by 16 offense levels because the loss is $2,717,801 which exceeds $1,500,000 but is less than $3,500,000, pursuant to USSG §§2S1.1 and 2B1.1. *Id.* ¶ 33. Two additional offense levels are added because the defendant was convicted under 18 U.S.C. § 1956, and two additional levels are added because the offense involved sophisticated laundering, pursuant to USSG § 2S1.1(b)(2)-(3). *Id.* ¶¶ 35-36. By pleading guilty, Marcus demonstrated acceptance of responsibility for his offense, making him eligible for a 3-level downward adjustment under USSG §3E1.1, *id.* ¶¶ 42-43, and he also qualified for a 2-level offense reduction for his lack of prior criminal history as a zero-point offender under USSG § 4C1.1(a), *id.* ¶ 41.

The final offense level is 21, and the defendant's criminal history category is I, which yields the advisory Guidelines range of 37 to 46 months' incarceration. *Id.* ¶¶ 44, 47, 102.

### C. <u>Restitution and Forfeiture</u>

This Court must order victim restitution. 18 U.S.C. § 3663A. The PSR includes a chart containing nine verified victims along with their respective restitution amounts, totaling $719,877. PSR ¶ 27. The victims of the offense include elderly seniors and small businesses who were deeply impacted by the fraud and money laundering, some of whom submitted impact statements. *Id.* ¶¶ 23-25. Although the underlying loss amount is $2,717,801 based on Marcus' financial records and admissions, the restitution amount is noticeably lower than the loss amount for two primary reasons: (1) due to the intervention of the government and financial institutions, large chunks of the fraudulent proceeds were frozen and/or returned and those corresponding

victims were excluded from the restitution list; and (2) given the nature of the crime (including the use of shell entities, third-party money mules, numerous accounts, churning activity, cryptocurrency purchases, and international transfers) which was intended to conceal and deceive, the government has not successfully (or cannot reasonably) trace the laundered proceeds to a verified innocent end-victims in every instance, despite the records showing and Marcus admitting that the funds transferred through his accounts were fraudulent proceeds and had no legitimate purpose. As result, the victim restitution list and figure is appropriately less than the loss figure.

As part of his plea agreement, Marcus also agreed to a forfeiture money judgment on Count Eight. PSR ¶ 5. This forfeiture amount is $25,000 for the specified transaction in Count Eight.

## III. SENTENCING ANALYSIS

### A. Legal Standard

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion) (ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in

18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). The Section 3553(a) factors require the Court to consider retribution, deterrence, incapacitation, and rehabilitation when determining a sentence. *Tapia v. United States*, 564 U.S. 319, 325 (2011).

**B. <u>The Nature and Circumstances of the Offense</u>**

The conduct involved here in undeniably serious. The defendant knowingly and consistently laundered money for a group of Nigerian-based fraudsters while also employed with the Dept. of Defense's Defense Logistics Agency (DLA). Between 2023 and 2025, Marcus and his business, SDM Clearing Depo LLC, attempted to launder more than $2.7 million through more than a dozen bank accounts. Marcus successfully converted a significant portion of victim funds into cryptocurrency, thereby allowing it to move into foreign accounts. Without the help and willing involvement of Marcus, his Nigerian counterparts would have struggled to move and launder the money they stole from U.S. victims through various romance fraud, cyber fraud, tax fraud, financing fraud, and business email compromise schemes.

Perhaps most concerning is the fact that Marcus engaged in the laundering conduct

despite knowing, in his own words, that he was making “fraudulent wire transfers” at the direction of Nigerian “scammers” who were committing “sophisticated online fraud.” Marcus continued to launder despite intervention from his family and reporting the Nigerian fraudsters to the police. He also continued to launder after being confronted by FBI agents and being told that he was transferring funds that had been stolen from other people. Notwithstanding these warnings, Marcus continued to take an active role in the criminal conduct by transferring large sums of fraudulently obtained proceeds and lying to his financial institutions, which included the circulation of forged invoices designed to make his transfers appear legitimate.

### C. The Defendant’s History and Characteristics

Marcus is a college graduate of Temple University, and prior to his arrest he resided (often alone) at his family home in Montgomery County, Pennsylvania. Marcus was employed with the Department of Defense from May 13, 2019, until his arrest on February 3, 2026, and held a security clearance and the position of Tailored Vendor Logistics Specialist, a GS-0301-11 position, with the Defense Logistics Agency. As result of the criminal charges, Marcus was terminated, barred from the military base, and his security clearance was revoked. Marcus is 34 years old, has no criminal history, no children, and no spouse or significant other.

A review of Marcus’ phone suggests his social network consisted entirely or nearly entirely of the Nigerian-based scammers. In a recorded interview, Marcus told the FBI that he talked with the Nigerians for a least 3-4 hours a day, which appears to be an understatement.[1]

[1] In April 2026, Marcus told a psychiatrist he would often spend 10+ hours a day chatting with the Nigerians – 2 hours before work, 1-2 hours during work breaks, 6-7 hours after work, and then one hour overnight to check his messages. The FBI’s review of his phone confirmed that nearly all of Marcus’ tens of thousands of messages were with Nigerian-based scammers.

Marcus has significant cognitive and social deficits, which have been alternatively diagnosed as static encephalopathy (a form of permanent brain damage) and autism spectrum disorder. The symptoms of these conditions can range from mild to severe. Although Marcus is an intelligent and highly functioning college graduate and (former) federal employee, his conditions nevertheless played a significant role in his readiness to engage in, and his decision to continue on with, people he knew to be foreign criminals.[2] Regardless of whether Marcus committed the crimes for companionship, or for money – in this case, it appears it was for both – in choosing to do so he prioritized his own interests and own desires over the truth that he knew and fully understood – that his Nigerian counterparts were committing fraud and using him to launder stolen funds.

Marcus has been detained since his arrest on February 3, 2026 (over eight months to date). The recommended sentence of time-served holds Marcus accountable while also ensuring that he does not serve an unnecessarily extended term of incarceration for having a disease, disorder, or disability. A sentence of time-served for Marcus with additional release conditions is correctly tailored to the unique circumstances presented here and balances the criminal conduct against Marcus' long-standing impairments which influenced that conduct. A sentence of time-

[2] Courts have granted significant departures or variances to defendants such as Marcus, who have documented autism or otherwise diminished faculties. *See, e.g., U.S. v. Huseth*, 2021 WL 4940915, *2 (D. Kan. Oct. 22, 2021) (granting a departure to probationary sentence under USSG § 5K2.13 based on the defendant's autism spectrum disorder, notwithstanding guidelines of 78 to 97 months, because due to his autism the defendant did not fully appreciate the wrongfulness and harm of his conduct); *U.S. v. Knott*, 638 F. Supp. 3d 1310, 1313 (M.D. Ala. Nov. 1, 2022) (granting variance to 27 months' home confinement based on the defendant's autism and diminished moral culpability, even though the defendant had a "high IQ, a good vocabulary, and no visible physical disabilities"; his guidelines were 78 to 97 months); *U.S. v. Meillier*, 650 F. Supp. 2d 887, 900 (D. Minn. Aug. 24, 2009) (granting variance to 1 day in prison for a defendant with "cognitive abilities [that] are severely limited," including an IQ of 70 and a "mental age" equivalent of an average 11-12 year old; his guidelines were 57 to 71 months).

served of approximately eight and a half months, is appropriate and just under these circumstances.

**D. Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, the maximum term of supervised release of three years is warranted, which would advance the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B) and protect the public, § 3553(a)(2)(C). The parties have stipulated – and Probation has recommended – a wide-ranging set of release conditions, to include restrictions and monitoring of Marcus' internet and financial activity, along with mental health therapy. Marcus' record indicates he responds well to structure, and the government endorses Marcus' enrollment in the STRIDES program and any other supervision, support, and guidance that can be offered or ordered.

## IV. CONCLUSION

Therefore, after factoring in all of the appropriate considerations, a sentence of time-served followed by three years of supervision is warranted in this case, subject to the

representations in the Sealed Supplement.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Samuel S. Dalke*
SAMUEL S. DALKE
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this Sentencing Memorandum has been served via ECF notification on:

Maranna Meehan, Esq.
Mark Wilson, Esq.
Federal Community Defender Office

*/s Samuel S. Dalke*
SAMUEL S. DALKE
Assistant United States Attorney

DATED: October 9, 2026.